THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. KEVIN McMILLAN, Defendant-Appellee.

Fifth District    No. 5—91—0165

Opinion filed August 4, 1992.

WELCH, J., dissenting.

Paula Phillips, State's Attorney, of Effingham (Norbert J. Goetten, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel M. Kirwan and Dan W. Evers, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

Kevin McMillan was charged with two counts of aggravated criminal sexual assault against a minor. On January 10, 1991, a hearing was held on the six-year-old minor's competency to testify. (See Ill. Rev. Stat. 1989, ch. 38, par. 115—14.) At that hearing the circuit court ruled that the minor would not be allowed to testify.

> "The Court finds that the minor witness is capable of expressing himself but not capable of expressing himself concerning the matter that is before the Court. The Court finds further that the minor is incapable of understanding the duty of a witness to tell the truth. The witness is disqualified."

On January 22, 1991, a hearing was held pursuant to section 115—10(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(b)) to determine whether out-of-court statements made by the minor would be admitted into evidence at trial. The court ruled that the minor's statements to his mother were admissible under the "excited utterance" exception to the hearsay rule. The circuit court suppressed the minor's statements to Boyd Vieregge, an investigator for the Department of Children and Family Services (DCFS), because those statements did not demonstrate "sufficient particularized guarantees of trustworthiness to be admissible in the face of defendant's Confrontation Clause objection." The State appeals the suppression of the statements the minor made to Vieregge. We affirm.

■ Section 115—10 of the Code of Criminal Procedure of 1963 contains a hearsay exception:

"(a) In a prosecution for a sexual act perpetrated upon a child under the age of 13, including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of the Criminal Code of 1961, the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child of an out of court statement made by such child that he or she complained of such act to another; and

(2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement." (Ill. Rev. Stat. 1991, ch. 110, par. 115—10.)

Under this provision, there are no precise tests for evaluating trustworthiness or reliability, but rather "particularized guarantees of trustworthiness must be drawn from the totality of the circumstances surrounding the victim's statements." *Idaho v. Wright* (1990), 497

U.S. 805, 819, 111 L. Ed. 2d 638, 654-55, 110 S. Ct. 3139, 3148-49; *People v. Coleman* (1990), 205 Ill. App. 3d 567, 563 N.E.2d 1010.

■ The relevant circumstances to be examined when determining reliability are those that surround the making of the statement and that render the declarant particularly worthy of belief. (*Wright,* 497 U.S. at 819, 111 L. Ed. 2d at 655, 110 S. Ct. at 3148.) According to *Wright,* factors that relate to whether hearsay statements made by a child witness in a child sexual abuse case are reliable include, but are not limited to: spontaneity and consistent repetition; mental state of the declarant; use of terminology unexpected of a child of similar age; and a lack of motive to fabricate. 497 U.S. at 821-22, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150; see also Kling, *The Confrontation Clause and Illinois' Hearsay Exception for Child Sex Abuse Victims,* 79 Ill. B.J. 560 (1991).

At the section 115—10 pretrial hearing, Kara Rickfelder, the minor's mother, described statements that the minor had made to her shortly after the alleged assault. Rickfelder testified that she and the minor had visited Rickfelder's grandmother and the defendant on January 6, 1990, at the grandmother's trailer home in Altamont. During their visit, the minor and the defendant left the trailer about the same time. Later they returned together. Rickfelder returned to her home in Effingham and was preparing supper when she noticed that the minor was quiet. She went to check on him and found him standing in his bedroom closet. His pants were down and he was holding a stuffed animal in front of himself.

Rickfelder asked the minor what he was doing, and he responded that he was "playing house." Rickfelder told him that they did not play house that way and asked whether anyone had touched him. The minor began crying and answered, "Yeah, Kevin." Rickfelder testified that her son told her that the defendant placed his "thing" in the minor's mouth and touched the minor's "pee-pee" and pinched him. Rickfelder testified that at the time of the incident there was no foreign substance on the minor or his clothing.

Boyd Vieregge, an investigator for the Department of Children and Family Services (DCFS), testified that he met with the minor and his mother at their apartment on January 9, 1990. Vieregge testified that the minor, using the colloquialism "pee-pee," told him that the defendant had touched the minor's "pee-pee" both inside and outside his clothing. The minor told him that the defendant also grabbed his hair and pulled the minor's head down to the defendant's penis, which he placed in the minor's mouth. The minor stated that "sticky" water came out of the defendant's penis while it was in the minor's mouth.

The defendant also placed his mouth on the minor's penis. Vieregge testified that the minor also told him that after he put his mouth on the defendant's penis the defendant told him to keep their activity a secret.

Vieregge also testified that the minor told him that the defendant placed his finger in the minor's bottom "where he goes poop" and that it had hurt. The minor told the defendant to stop, but the defendant said that he was going to do it again. However, the defendant ceased the assault.

Vieregge testified that as an investigator for DCFS he has interviewed at least several hundred children about allegations of sexual abuse. In making his reports of those interviews, he had not found all the allegations to be substantiated. Vieregge has been a child abuse investigator for approximately 12 years. He testified that he has attended a number of seminars designed to teach DCFS employees effective methods of interviewing children. In July 1990, he completed a DCFS requirement for 20 hours of such training in a two-year period. Prior to the effective date of that requirement, Vieregge had attended probably 10 or 15 different courses or seminars for training and interviewing techniques and for the use of anatomically correct dolls. Those who spoke at the seminars, including physicians and psychologists, taught that questions asked of children should be open-ended and not leading. Vieregge testified that obtaining details in response to nonleading questions, watching the child's body language, and ascertaining whether the child can distinguish day and night are ways of determining whether a child is credible.

On cross-examination, Vieregge testified that he did not hold a Ph.D. or a master's degree in psychology and that he was not a psychiatrist or a registered clinical psychologist. Vieregge began talking with the minor about school and similar matters before asking him questions and receiving his answers about his contact with the defendant. He did not have a tape recorder when he interviewed the minor, whose mother was present on the opposite side of the room. Vieregge stated that during his interview of the minor he wrote out the questions and answers as they were asked and given.

The circuit court suppressed Vieregge's testimony as to any statements the minor made to him and explained its ruling as follows:

> "[T]he child's statements in response to the DCFS Child Abuse Investigator fail to demonstrate sufficient particularized guarantees of trustworthiness to be admissible in the face of defendant's Confrontation Clause objection. The statements were not spontaneous but were in response to questioning. The

allegations of sexual abuse were not consistently repeated by the child: to the mother he complained of fondling and fellatio on defendant; to the DCFS Investigator he complained of fondling outside his clothing, fondling inside his clothing, forced fellatio on defendant to orgasm, defendant's fellatio on the child, and digital sodomy; and to the Court the child denied any such conduct by defendant. The child's mental state is not conducive to truthtelling, *i.e.*, the child is incompetent to testify precisely because he cannot distinguish between truth and falsity. While it is true that the child did not, according to the investigator's holographic notes, use any terminology unexpected of a five-year-old child, the interview was not videotaped nor tape-recorded nor was a verbatim transcript taken. The child had a motive to fabricate: the mother had caught the child in the closet where he had been before (because the mother 'figured he was in the closet'), the child [*sic*] there made an allegation of sex abuse against defendant arguably to defuse the mother's ire, and the DCFS Investigator allowed the mother to be present while he questioned the child. The DCFS Investigator, even according to his own holographic notes, asked leading questions of the child: 'Were you touched under the clothes?' 'Did he shake his body or use his hand?' 'Did Kevin put his mouth on your body?' And of course the DCFS Investigator had a preconceived idea of what the child's complaints should be to seem consistent with the Child Abuse Hotline report which he specifically had come to investigate.

\*\*\* The child's hearsay statements to the DCFS Child Abuse Investigator must be suppressed."

Because Vieregge's notes documenting his interview with the minor appear to underly the court's decision, they are set forth below:

"Initially [the minor] and I talked about school. He said he was in kindergarten and that he likes school. He then showed me some of the things he had gotten for Xmas—2 games a stuffed animal and 2 Tonka trucks. I then told [the minor] I wanted to talk to him about good touches and bad touches. I asked him if anyone else had ever talked to him about that. [The minor] said yes—the doctor. I told him I wanted to talk to him about that again to make sure he understood. I then discussed and explained good touches and bad touches w/ [the minor].

Q. Has anyone ever given you a bad touch?

A. Yes.

Q. Who?

A. Kevin.

Q. What did Kevin do?

A. He touched my pee-pee.

I then explained touches over and under the clothes to [the minor] by touching my arm on top of my sweater w/my hand as a touch over or on top of the clothes and touching my arm with my hand under my shirt and sweater as a touch under the clothes.

Q. How did Kevin touch you?

A. On top of my clothes.

Q. Where did this happen?

A. At Grandmas.

Q. Where does Grandma live?

A. Altamont.

Q. Did this happen inside or outside?

A. Outside.

Q. Was anyone else out there when this happened?

A. No—just me and Kevin.

I then talked to [the minor] about days of the week telling him today was Tuesday—a school day, that yesterday was Monday a school day, the day before that Sunday—w/Sunday school and church and the day before that was Saturday—cartoon day when cartoons are on all morning.

Q. What day did this happen?

A. Saturday.

Q. Did anything else happen?

A. (He put his hand under his shirt sleeve—as I had done when explaining a touch under the clothes.)

Q. Were you touched under the clothes?

A. Yes.

Q. How?

A. Kevin put his hand under my clothes and touched my pee-pee.

Q. Then what happened?

A. Kevin shook his pee-pee at me.

Q. Where?

A. Outside behind the trailer.

Q. How did Kevin do this—did he shake his body or use his hand. [*sic*]

A. He shook his body. ([The minor] made motions with his hip.)

Q. Then what happened?

A. He grabbed my head (as he said this [the minor] grabbed the hair of his head and pulled his head forward) and put his pee-pee in my mouth.

Q. Did anything come out of his pee-pee?

A. Water but it was sticky.

Q. Did Kevin say anything to you?

A. He said 'keep it a secret.'

Q. Did Kevin put his mouth on your body?

A. Yes.

Q. Where on your body?

A. Kevin put his mouth on my pee-pee.

I then explained words 'before' and 'after' to [the minor] and before being what happened first.

Q. Can you tell me which one happened first?

A. I had to put my mouth on Kevin's pee-pee first, then Kevin put his mouth on my pee-pee.

Q. Did anything else happen?

A. ([The minor] put his hand on his bottom and patted it.)

Q. Your bottom?

A. Yes.

Q. What about your bottom?

A. He touched it.

Q. How did he touch it?

A. With his hand.

Q. On top of the clothes or under the clothes?

A. Under the clothes.

I then talked about the bottom having two cheeks and a crack in the middle.

Q. Where did he touch your bottom?

A. The crack.

Q. What did he touch the crack with.

A. His fingers.

Q. Did it hurt?

A. Yes.

Q. Did he put his finger inside your bottom or just in the crack.

A. In my bottom where I go poop—that's when it hurt.

Q. Did you say anything?

A. I said no.

Q. Did Kevin say anything?

A. He said Yeah.

Q. Did he stop.
A. No—he kept on doing it.
Q. Did you say anything else?
A. I said stop.
Q. Did Kevin say anything?
A. He said 'I'm going to do it again.'
Q. Then what happened?
A. He stopped.
Q. Then what happened?
A. I went back in the trailer.
Q. Where does Kevin stay?
A. At Grandma's.
Q. Was this in the morning or afternoon?
A. Afternoon.
Q. Was it light out or dark?
A. Still light.
Q. Has anyone else given you a bad touch.
A. No.
Q. Has anyone ever made you touch them?
A. No.
Q. Is the time you just told me about on Saturday the only time this has happened?
A. Yes."

A court of review cannot be permitted to simply substitute its assessment of the evidence for that of the trial court (which saw and heard the witnesses who testified) when it reviews a trial court determination that hearsay statements are admissible under section 115–10. (*People v. Deavers* (1991), 220 Ill. App. 3d 1057, 1068, 580 N.E.2d 1367, 1375.) The appropriate standard of review in such a case is whether the trial court's decision is contrary to the manifest weight of the evidence. (220 Ill. App. 3d at 1068, 580 N.E.2d at 1375.) In the present case, our review of the record satisfies us that the trial court's determination was not contrary to the manifest weight of the evidence.

The trial court found that the statements to Vieregge were not spontaneous but were in response to questioning. The State agrees that the minor made his statements to Vieregge three days after the alleged incident. The trial court next found that the "allegations of sexual abuse were not consistently repeated by the child." The State argues that the testimony by the minor's mother about his complaint to her was probably more general than Vieregge's testimony because Vieregge is a trained and experienced investigator.

Nonetheless it is undisputed that the minor was not consistent in the allegations of sexual abuse. The trial court's finding is supported by the record.

■ The court next found that the child's "mental state is not conducive to truth telling." A child's incompetence to testify at trial does not *per se* render the child's out-of-court complaint unreliable under section 115—10. A case-by-case analysis is necessary to determine whether the statement is made unreliable under the specific facts and circumstances of the case. (*Idaho v. Wright* (1990), 497 U.S. at 824, 111 L. Ed. 2d at 658, 110 S. Ct. at 3151; *People v. Rocha* (1989), 191 Ill. App. 3d 529, 539, 547 N.E.2d 1335, 1341.) The court's order refers to the competency hearing wherein the child denied any misconduct by the defendant when questioned in court. We have reviewed the transcript of the minor's competency hearing. Under the circumstances of this case, we cannot conclude that the trial court erred in finding that the minor's incompetence as a witness affected the reliability of his statements to Vieregge.

■ The State next challenges the trial court's finding that Vieregge asked leading questions and had a preconceived notion of what the child's complaints should be to be consistent with the child abuse hotline report. It is apparent from the record that Vieregge did have prior knowledge of the minor's complaints as related to his mother. A review of Vieregge's interview notes confirms that leading questions were asked of the minor. While Vieregge's notes indicate that much of the interview was conducted using open-ended questions, the trial court considered that "the interview was not videotaped nor tape-recorded nor was a verbatim transcript taken." This fact is not disputed by the State. Vieregge's notes and his testimony are the only evidence of the interview. Defendant argues that the reliability of the minor's statement rests upon Vieregge's credibility in how he conducted the interview. Credibility of a witness is a matter for the trial court to determine, and a court of review will not disturb the trial court's finding unless it is against the manifest weight of the evidence. (*Orchard Shopping Center, Inc. v. Campo* (1985), 138 Ill. App. 3d 656, 485 N.E.2d 1248.) We agree with the defendant that the trial court could have concluded that Vieregge had not conducted an interview conducive to obtaining a reliable statement. Given the facts of this case and because the trial court observed Vieregge's demeanor while testifying, we cannot conclude that the trial court's conclusion was contrary to the manifest weight of the evidence.

■ Finally, the trial court found that the minor "had a motive to fabricate." There is no direct evidence that the mother found the mi-

nor in the closet on prior occasions or that the minor feared punishment from his mother because he was in the closet. However, the trial court is in a better position to judge the credibility of the witnesses and in this case was able to observe the demeanor of the mother while testifying. The inferences the trial court could draw from the mother's manner while testifying support the trial court's factual conclusion.

▎ The court has considerable leeway in its consideration of appropriate factors when evaluating the totality of the circumstances surrounding a victim's statements to determine their reliability. (*Wright*, 497 U.S. at 822, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150; *People v. Deavers* (1991), 220 Ill. App. 3d 1057, 580 N.E.2d 1367.) Under the circumstances in this case we cannot find that the trial court considered inappropriate factors in making its determination. In light of the above, we hold that the trial court's decision that the minor's statements to Vieregge were unreliable and, thus, inadmissible under section 115—10 of the Code was not contrary to the manifest weight of the evidence.

Affirmed.

GOLDENHERSH, P.J., concurs.

JUSTICE WELCH, dissenting:

I respectfully dissent. As the circuit court noted in its February 12, 1991, order, the State sought to introduce the child complainant's hearsay statements to the DCFS investigator pursuant to the statutory exception to the rule against hearsay, and defendant sought to bar the introduction of the statements because such introduction would constitute a violation of his constitutional right of confrontation. Following a hearing to determine whether the hearsay statements could be admitted, the circuit court suppressed the hearsay statements of the child complainant to the DCFS investigator. The circuit court found in its February 12, 1991, order that the child's statements to the investigator failed to demonstrate sufficient particularized guarantees of trustworthiness to be admissible in the face of defendant's confrontation clause objection.

Section 115—10(a)(2) of the Code of Criminal Procedure of 1963 (Code) provides that for any prosecution of a sexual offense committed on a child under age 13, the testimony of an out-of-court statement made by the child describing any complaint of such an act or matter or detail pertaining to any act which is an element of the

charged offense is admissible as an exception to the hearsay rule. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(a)(2).) This section of the Code further provides:

"Such testimony shall only be admitted if:

(1) The Court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(b).)

The confrontation clause bars the admission of some evidence which would otherwise be admissible under an exception to the hearsay rule. However, the confrontation clause will, where necessary, permit the admission of certain hearsay statements against a defendant, if the prosecution is able to demonstrate the unavailability of the declarant and that his or her statement bears adequate indicia of reliability. Because the evidence did not fall within a firmly rooted hearsay exception, reliability, in the instant case, must be proved by a showing of particularized guarantees of trustworthiness, in order to pass constitutional muster. See *Idaho v. Wright* (1990), 497 U.S. 805, 814-15, 111 L. Ed. 2d 638, 651-52, 110 S. Ct. 3139, 3146.

The particularized guarantees of trustworthiness required for admission under the confrontation clause must be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief. (*Idaho v. Wright*, 497 U.S. at 820, 111 L. Ed. 2d at 655-56, 110 S. Ct. at 3149.) *Wright* identified several factors which it felt properly related to whether hearsay statements made by a child witness in child sexual abuse cases are reliable; to wit, spontaneity and consistent repetition, mental state of the declarant, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. The Court emphasized, however, that these factors were not exclusive and declined to endorse a mechanical test for determining "particularized guarantees of trustworthiness". *Wright*, 497 U.S. at 821, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.

The circuit court found that the child's statements to the investigator were not spontaneous but in response to questioning, and that the allegations of sexual abuse were not consistently repeated by the child. However, with respect to count I of the information, which charged that defendant placed his penis in the mouth of the complain-

ant/child and which was the only count for which the court found probable cause at the preliminary hearing, the child's statement to the DCFS investigator was consistently repeated from the initial declaration made by the child to his mother on the day of the alleged sexual abuse. The child told both his mother and the investigator that defendant had placed his penis in the child's mouth. While the child elaborated on that statement in response to further questioning by the investigator, stating that defendant had grabbed his hair and pulled his head down to the defendant's penis and placed it in his mouth, I believe both such statements were consistent. I therefore believe that this particular finding was against the manifest weight of the evidence.

The court also noted that the investigator used leading questions of the child and found that the investigator had a preconceived idea of what the child's complaints should be, based on the Child Abuse Hotline report that he had received and was presently investigating. We note that the child's statement that defendant placed his penis in his mouth was not made in response to a leading question; however, the child's statement that "water" had come out of defendant's penis "but it was sticky" was made in response to the leading question, "did anything come out of his pee-pee?" Additionally, the court found that while the child did not use any terminology unexpected of a five-year-old child, no videotape or tape recording was taken of the interview.

The Supreme Court in *Wright*, however, rejected the dispositive weight placed by the State appellate court therein on the lack of procedural safeguards at the interview (failure to record the interview on videotape, the asking of leading questions and questioning of the child with a preconceived idea of what she should be disclosing), finding that such procedural requirements may in many instances be inappropriate or unnecessary to a determination whether a given statement is sufficiently trustworthy for confrontation clause purposes. The Court noted that the use of leading questions with children, when appropriate, does not necessarily render responses untrustworthy. The Court also noted that a videotape requirement may not be feasible, especially, as in the instant case, where the defendant had not yet been criminally charged. The Court stated that although these procedural guidelines may enhance the reliability of such out-of-court statements it would decline to read into the confrontation clause a preconceived and artificial litmus test for the procedural propriety of professional interviews in which children make hearsay statements against a

defendant. *Wright,* 497 U.S. at 818, 111 L. Ed. 2d at 654, 110 S. Ct. at 3148.

In the instant case, the portions of the child's statement to the investigator, relevant to count I of the information, involved the allegation of oral sex. I do not believe that the leading question asked with regard to the specifics of the act destroyed the reliability of the child's response. As the Court noted in *Wright,* the unifying principle is that the factor relate to whether the child declarant was particularly likely to be telling the truth when the statement was made. (*Wright,* 497 U.S. at 821, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.) In spite of the fact that the Supreme Court in *Wright* affirmed the decision of the appellate court reversing an order which denied suppression of a child's out-of-court statement, the Court gave approval to two factors with which the trial court supported its determination that the child's statement should not be suppressed: whether the child had a motive to "make up a story of this nature," and whether, given the child's age, the statements are of the type "that one would expect a child to fabricate." The nature of the child's response to the leading question asked by the DCFS investigator in the instant case was certainly not a response that a typical five-year-old child was likely to have made up and indeed was consistent with a description of the sexual abuse that was alleged, indicating that the child was likely to be telling the truth when the statement was made. I therefore believe the circuit court placed undue emphasis on the leading question factor.

I also believe that the circuit court's emphasis on the factor that the investigator had a preconceived idea of what the child should be disclosing places undue restriction on investigators of child sexual abuse claims and, from a practical standpoint, should not be given undue emphasis unless it is clear from the child's statement that the investigator is "putting words in the child's mouth." In this particular case, I did not find Mr. Vieregge to be directing the child's statement to support the charge of sexual abuse that he was investigating.

The circuit court also found that the child had a motive to fabricate because he sought to defuse the mother's ire at having found him in the closet, noting also that the mother was allowed to be present when the DCFS investigator interviewed the child. However, there is nothing in the record to support such speculation on the part of the court and nothing in the record to indicate any premature sexual precocity on the part of this young child which might cause the child to tell his mother that defendant had placed his penis in his mouth. We note that the child's statement to his mother was not suppressed by

the court. I believe that the finding of the court with regard to the child's motive to lie was also not supported by the manifest weight of the evidence.

The circuit court also found that the child's mental state was not conducive to truth-telling, noting that the child was incompetent to testify precisely because he could not distinguish between truth and falsity. However, the Supreme Court rejected the defendant's contention in *Wright* that the child's out-of-court statements were presumptively unreliable on the ground that the trial court found the child incompetent to testify at trial. As the Court emphasized, the relevant circumstances to be considered include only those that surround the making of the statement and that render the declarant particularly worthy of belief. (*Wright*, 497 U.S. at 820, 111 L. Ed. 2d at 655-56, 110 S. Ct. at 3149.) While the child may have been unable to answer questions in a courtroom in which the defendant was seated, about a traumatic event which was alleged to have taken place some 12 months earlier, I do not believe the court can reasonably infer from this that at the time the child made the statement to the DCFS investigator, he was not truthfully relating what had happened to him on January 6, 1990. Indeed, by finding that the child's out-of-court statement to his mother constituted an excited utterance exception to the hearsay rule, the circuit court implicitly found such statement reliable. (See *Wright*, 497 U.S. at 815, 111 L. Ed. 2d at 652, 110 S. Ct. at 3146 ("Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception").) I believe the circuit court's finding that the child's mental state was not conducive to truth-telling was against the manifest weight of the evidence and based upon an irrelevant factor under the reasoning of *Idaho v. Wright*.

In my opinion the prosecution did, in fact, demonstrate that the declarant was unavailable, that the evidence showed particularized guarantees of trustworthiness, and accordingly that the declarant's statement bore adequate indicia of reliability. The prosecution also showed that there was corroborative evidence of the act which was the subject of the statement, by way of admissible evidence of the child's statement to his mother. Therefore, the portion of the child's statement to Mr. Vierrege relevant to proof of Count I of the information should not have been suppressed.

The appropriate standard of review of a trial court's determination pursuant to section 115—10 of the Code is whether the ruling was clearly contrary to the manifest weight of the evidence. (*People v. Deavers* (1991), 220 Ill. App. 3d 1057, 1068, 580 N.E.2d 1367, 1375.)

Additionally, a reviewing court will reverse a circuit court's order suppressing evidence when that ruling is manifestly erroneous. (*People v. Smith* (1991), 208 Ill. App. 3d 44, 48, 566 N.E.2d 939, 941-42.) I believe that the February 12, 1991, ruling was clearly contrary to the manifest weight of the evidence with regard to the section 115—10 determination and manifestly erroneous with regard to the confrontation clause analysis. I would hold that the circuit court improperly suppressed the complainant/child's statements to the DCFS investigator and accordingly would reverse the February 12, 1991, ruling of the circuit court of Effingham County.